IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

INTERNATIONAL UNION OF
BRICKLAYERS' AND ALLIED
CRAFTSMEN, LOCAL UNION
NO. 15,

        Plaintiff,

v.                 //    CIVIL ACTION NO. 1:04CV93
                            (Judge Keeley)

RICH FARMS, INC.,

        Defendant.

## MEMORANDUM OPINION AND ORDER

Before the Court is the motion for summary judgment of the plaintiff, the International Union of Bricklayers' and Allied Craftsmen, Local Union No. 15 ("IUBAC"), in which it seeks to enforce an arbitration decision pursuant to § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a). For the following reasons, the Court **GRANTS** the plaintiff's motion (dkct no. 10).

### I. FACTUAL BACKGROUND

IUBAC is a union that represents "certain skilled employees in the construction industry," particularly "journeyman and apprentice bricklayers." Rich Farms, Incorporated ("Rich Farms"), is a company that engages in building and construction work.

A collective bargaining agreement ("CBA") exists between the IUBAC and the Construction Employers Association ("Association");

1

## MEMORANDUM OPINION AND ORDER

however, Thomas A. Rich ("Rich"), President of Rich Farms, is a "non-association" employer, which means that he is not a member of the Association, and, therefore, not a party to the CBA.

**A.   The CBA**

The 2000-2005 CBA, executed to prevent "strikes and lockouts, and for facilitating a peaceful adjustment of any and all grievances and disputes that may arise between the Employer and employee in the Masonry Industry . . .," provides that "Local Union #15, at all times during the progress of any job, shall furnish at least seventy-five (75%) percent of the bricklayers (if available) employed by the contractor, plus the odd man, if any . . ."[1]

The CBA also contains a grievance and arbitration provision. Under this provision, whenever "any dispute arise[s] as to the interpretation, application or claimed violation of any provision" of the CBA:

> (a)   The Employer's designated representative and the Union Steward shall meet to discuss the dispute and attempt to render a decision within twenty-four (24) hours from the time the dispute is brought to the other party's attention.

---

[1] Bricklaying masonry is defined as "the laying of brick in, under or upon any structure or form of work where brick is used," including, inter alia, "in the ground or over its surface, or beneath water," fireproofing, glass masonry, "or any substitute for the above material," brick paving and the installation of precast stone or other fabricated masonry units.

    (b)  If no agreement is reached in step (a) above, the Union's Business Representative and the Employer's designated representative shall meet within twenty-four (24) hours (two days) in an effort to resolve the dispute.

    (c)  If no agreement is reached in step (b) above, the Business Representative of Bricklayers/Cement Masons Local No. 15 and the Executive Director of the Construction Employers Association, or their designated representatives shall meet within twenty-four (24) hours (two days) in an effort to resolve the dispute.

    (d)  If the dispute is not resolved in step (c) above, the matter shall be submitted to the Joint Arbitration Committee for determination upon the written request of either the Union of Construction Employers Association. The Joint Arbitration Committee shall meet within forty-eight (48) hours (four days) after such request is made in an effort to resolve the dispute.

    (e)  Notwithstanding the provisions of steps (a) and (d) above, if either the Employer or the Union regards a dispute to be of an emergency nature, the dispute may be submitted immediately to step (c) of the grievance procedure, without the necessity of going through steps (a) and (b) .
. . .

**B.**   **Rich Farms' Acceptance of Agreement**

In 2001, Rich Farms needed union employees for a construction job at West Virginia University ("WVU"). Accordingly, on May 8, 2001, in a parking lot at WVU, Rich signed an "Acceptance of Agreement" contract ("Agreement") with the Bricklayers and the district branch of the IUBAC. This agreement provides as follows:

                  ACCEPTANCE OF AGREEMENT
                  (Non-Association Employer)
In signing this Acceptance of Agreement, the undersigned firm does hereby authorize <u>the applicable</u>

>       <u>Contractors Assocation</u> as its collective bargaining
>  representative for all matters contained in or
>  pertaining to the current and any subsequent approved
>  labor agreements between the contractor's association
>  and Bricklayers and Alied Crafts District Council and
>  its affiliated Local Unions 1, 5, 6, 9, 11, and 15 of
>  WV. In doing so, the undersigned firm agrees to
>  comply with and be bound by all of the terms and
>  conditions contained in said current and subsequent
>  approved labor agreements. This agreement, shall
>  become effective on the 1st day of June, 1993. It
>  shall remain in effect until terminated by the
>  undersigned employer giving written notice to <u>the
>  applicable Contractors Assocation</u> and to Bricklayers
>  and Allied Crafts District Council at least 60 days
>  but not more than 95 days prior to the current
>  anniversary date of the applicable labor agreement.
>       The employer agrees to recognize the Bricklayers
>  and Allied Crafts District Council as the collective
>  bargaining agent for all employees performing
>  construction work as defined in the Collective
>  Bargaining Agreement coming within the jurisdiction
>  of the Bricklayers and Allied Crafts Disctrict
>  Council on all present and future jobs sites.

(emphasis in original.) Thus, Rich designated the Association as his company's collective bargaining representative and recognized the IUBAC as the collective bargaining agent for union employees. Importantly, he also bound Rich Farms to the current, and any future, CBAs unless it provided written notice to the Association and the IUBAC of an intent to terminate the agreement within 60 to 95 days prior to the anniversary date of the CBA.

According to Rich, he believed that the Agreement only bound him to the CBA for the West Virginia University project. Moreover,

he accuses the Association of failing to provide him with a copy of the CBA.

In an affidavit, however, Leroy Hunter, Jr. ("Hunter"), a representative of the IUBAC, claims that he provided Rich with a copy of the CBA on the date of signing. According to Hunter, this is IUBAC's established practice to ensure that union employees are paid and treated properly on the job.

C. **Suncrest Construction Job**

Rich Farms substantially complied with the CBA on the WVU project, although the IUBAC states that the fringe benefits due to the employees on that job remain unpaid.

In December 2003, however, Rich Farms started a construction job at the Suncrest Office Complex in Monongalia County, West Virginia, but failed to employ Union members as required by the CBA. The parties dispute whether four or seven employees handled this job.

According to the IUBAC, the Suncrest project required masonry work. Rich Farms, however, contends that the job concerned installing a mortarless retaining wall, which is typical for a landscaping contractor. He argues that he was not bound by the CBA for the Suncrest job and, in any event, did not believe that the CBA covered the type of work involved.

## MEMORANDUM OPINION AND ORDER

According to the minutes of the Joint Arbitration Committee Hearing, in December 2003, a steward informed the IUBAC that he had observed masonry units being laid down in the parking area at Suncrest. Consequently, the IUBAC sent "Mr. Dalton" ("Dalton") to visit the job site. Hunter claims that Dalton "advised the members of the crew that a contract existed between Local 15 and Rich Farms and as such they should be receiving wage and fringe benefit rates stipulated therein." Dalton also noted that many of the crew members had also worked on the WVU project. The employees stated that they would inform Rich of his visit and have him contact the IUBAC.

On December 19, 2003, Hunter returned to the Suncrest work site and discovered that additional masonry work had been performed. He attempted to contact Rich on December 31, 2004, but received no answer.

Later that day, Hunter returned to the job site and questioned employees as to whether they had discussed the project and the Union contract with Rich. When the employees failed to respond, Hunter tried again to contact Rich.

Hunter alleges that he called and left messages for Rich at the job site and at his home three times between December 31, 2003 and

January 5, 2004. Rich claims he did not receive these messages, and notes that he was out of town during that time period.

D. **Grievance and Arbitration Procedure**

On January 15, 2004, the IUBAC filed a formal grievance against Rich Farms alleging violations of the parties' contract. Subsequently, Robert Worchester ("Worchester"), Executive Director of the local Association, and designated as Rich Farms' representative under the Agreement, contacted Rich to discuss the matter.

According to Worchester's affidavit, Rich agreed to participate in a pre-grievance meeting with the Union on January 28, 2004; thus, on January 22, 2004, Worchester sent Rich a letter confirming these arrangements. Rich, however, failed to appear at the January 28, 2004 meeting.

Rich later contacted Worchester and explained that he had mistakenly noted January 29, 2004 as the meeting date. Worchester suggested that Rich contact Hunter to reschedule. According to Rich, when he attempted to do so, Hunter refused his call.

Consequently, the grievance proceeded to the Joint Arbitration Committee ("Committee"). The Committee scheduled the matter for a hearing on February 3, 2004, but Rich was unable to attend on that date. According to Rich, when he requested that the date be

changed, the Committee denied his request. The IUBAC, however, claims that the record does not reflect any such request by Rich.

On February 3, 2004, the Committee held the arbitration hearing as scheduled. According to the minutes, Hunter "opened the meeting with a review of the circumstances" of the case. He advised the Committee regarding the May 2001 Agreement, the WVU project, the Suncrest project and Rich's nonresponsive behavior.

Subsequently, "there being no representation by Rich Farms present," the Committee, which consisted of Worchester himself and a "Mr. Wilson," met for twenty minutes and then unanimously upheld all the charges and requests in the IUBAC's grievance.

Rich did not take any action to vacate the Committee's decision. Although he claims he failed to take such action because he never received a copy of the decision, the record reflects that Rich Farms received a certified copy, return receipt requested, of the Committee's original decision on February 11, 2004, and a certified copy, return receipt requested, of a revised version of that decision on February 23, 2004.[2] Rich Farms' receipt of these certified copies is evidenced by signed certified mail receipts provided to the Court by the Assocation.

---

[2]According to Worcester's affidavit, the Committee issued a revised decision because the original decision had inadvertently omitted relevant information.

E.     **IUBAC's Prayer for Relief**

The IUBAC contends that, despite the Committee's decision, Rich has continued to hire nonunion employees. It now asks this Court to enforce the arbitration decision pursuant to § 301 and enjoin Rich Farms from failing to honor the Committee's decision. Further, the IUBAC requests that the Court grant it $80,665.20 plus interest in damages ($1,792.56 per working day) and a reasonable amount for attorney's fees. In the alternative, it asks that the Court consider this matter as a breach of contract action.

Rich concedes that he has not complied with the Committee's decision, but claims that he is not bound by the CBA and has not employed workers in violation of that agreement. Further, Rich argues that the Committee's decision should be vacated because its failure to postpone the arbitration hearing prevented him from presenting relevant evidence in his company's favor.

## II.   LEGAL ANALYSIS

A.     **Standard of Law**

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). In considering a motion for summary judgment, the court is required to draw reasonable inferences from the facts in a light most favorable to the nonmoving party. Id. at 255.

The moving party has the burden of initially showing the absence of a genuine issue concerning any material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970). Once the moving party has met its initial burden, the burden shifts to the nonmoving party to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). However, "the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial." Local 49 Operating Eng'rs Health & Welfare Fund v. Fleuger Construction Co., 2004 U.S. Dist. LEXIS 18440, *7 (D. Minn. Aug. 18, 2004).

**B.    Reviewability of Arbitrator's Decision**

A party cannot challenge the validity of an arbitration decision after the expiration of the applicable statute of

limitations. Sheet Metal Workers Int'l Assoc. v. Power City Plumbing & Heating, Inc., 934 F.2d 557, 560-61 (4th Cir. 1991). This is true even when the party raises invalidity as a defense to an action to enforce an arbitration agreement. Id.

Further, as long as a party has been provided proper notice and is aware of the arbitration proceeding, the arbitration award "is valid and fully enforceable" despite that party's absence. Id. at 561.

Under the United States Arbitration Act, 9 U.S.C. § 12, "[n]otice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered." Power City, 934 F.2d at 560. Rich Farms received certified copies of the Committee's original decision and the Committee's revised decision on February 11, 2004 and February 23, 2004, respectively. By its own admission, it did not raise the argument that the Committee's decision should be vacated until June 28, 2004, when it filed its Answer to IUBAC's complaint. Thus, Rich Farms' attempt to invalidate the Committee's decision is untimely and cannot be considered by the Court.

C.   **Enforceability of Arbitration Award**

Having determined that the Court is precluded from reviewing the *validity* of the Committee's decision, this Court must now determine the *enforceability* of the Committee's decision.

"A district court's review of an arbitration award "is among the narrowest known to the law." United States Postal Service v. American Postal Workers Union, AFL-CIO, 204 F.3d 523, 527 (4th Cir. 2000) (internal quotations omitted). "A court sits to 'determine only whether the arbitrator did his job - not whether he did it well, correctly, or reasonably, but simply whether he did it.'" Id. (quoting Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union, 76 F.3d 606, 608 (4th Cir. 1996)). "As long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 38 (1987).

Thus, "[a]n arbitration award is final if the arbitration decision 'draws its essence from the collective bargaining agreement,' and the award is not procured by fraud and is not against public policy." Power City, 934 F.2d at 561.

MEMORANDUM OPINION AND ORDER

In this case, a careful review of the record establishes that the Committee's decision is fully supported by the CBA. It reviewed the circumstances of the case and determined, based on the evidence presented, that Rich Farms had an obligation to hire union employees for masonry work under the CBA.

### III. CONCLUSION

The Committee's decision is supported by the CBA and is not fraudulent or against public policy. Further, the defendant's defense that the arbitration award should be invalidated is barred by the applicable statute of limitations. Accordingly, the plaintiff's motion for summary judgment is **GRANTED** (dckt no. 10).

The parties are further **ORDERED** to appear before the Court on **September 16, 2005 at 9:00 a.m.** at the Clarksburg, West Virginia, point of holding court, for a hearing on the issue of damages.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to counsel of record.

DATED: September _____7_____, 2005.

_____
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE